

**FILED & ENTERED**

**JUN 28 2013**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** steinber **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>1617 Westcliff, LLC<br><br><br><br>Debtor(s). | Case No.: 8:12-bk-19326-MW<br>CHAPTER 11<br>**MEMORANDUM DECISION AND ORDER**<br>Date:       June 17, 2013<br>Time:       2:00 p.m.<br>Courtroom: 6C<br>                 411 West Fourth Street<br>                 Santa Ana, CA 92701 |

    This matter comes before the Court on (1) Burnham-Ward Properties, LLC's motion for order compelling Debtor's compliance with court-approved purchase agreement, directing escrow to return deposited funds to Burnham-Ward Properties, LLC and awarding attorneys' fees and costs (the "BW Motion"), (2) Debtor's emergency motion for order cancelling escrow, directing title company to hold buyer's deposit and permitting debtor to market property and enter into purchase agreement subject to further court approval ("Debtor's Motion"), and (3) Debtor's motion for entry of order directing title company to release deposit to Debtor ("Debtor's Supplemental Motion"). Additionally, Burnham-Ward Properties, LLC ("BW") has requested that the Court take

judicial notice of certain matters in support of the BW Motion.

BW's request for judicial notice is granted.

**FINDINGS OF FACT**

Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code on August 2, 2012. Debtor's only substantial asset is commercial real property known as 1617 Westcliff Drive, Newport Beach, CA 92660 (the "Property"). The Property is a single building office complex comprised of 31,364 square feet of rentable space on 1.56 acres.

Debtor and BW entered into a Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate with respect to the Property (the "Purchase Agreement") on November 28, 2012. The Purchase Agreement (which was subject to Court approval) named First American Title Insurance Company (the "Title Company") as the escrow agent and provided for a sale of the Property by Debtor to BW for $9.9 million, payable $3.6 million in cash and $6.3 million by the assumption of an existing note and deed of trust on the Property held by the secured lender, Wells Fargo Bank, N.A., as trustee (the "Bank"). Section 4.1 of the Purchase Agreement required the Buyer to pay a deposit of $200,000 to the Escrow Company as earnest money. Section 21 of the Purchase Agreement provided for liquidated damages in favor of the Debtor in the amount of $200,000 in the event BW failed to perform its obligations under the Purchase Agreement. Section 10.2 of the Purchase Agreement required Debtor to deliver certain documents to BW at the closing, such as a grant deed, assignments of existing leases, a bill of sale and beneficiary statements concerning the existing note.

The Addendum to the Purchase Agreement provides in Section 1.1 thereof (entitled "Expected Closing Date") that "in the event the parties have been unable to obtain Assumption Approval . . . within forty-five (45) days following the Date of

Agreement [i.e., the date of the Purchase Agreement], either party shall have the right to terminate this Agreement." Section 3.1(c) thereof provides that "*Buyer and Seller shall use their commercially reasonable and diligent efforts to promptly apply for Buyer's assumption of the Existing Note and Existing Deed of Trust and obtain Assumption approval.* Buyer shall be responsible for the 1% assumption fee and any costs of assumption, and acknowledges that the lender may require impound or "escrow" accounts in the approximate amount of $150,000.00, to be paid by Buyer separate and aside from the Purchase Price." (italics added by Court).

Section 33 of the Addendum to the Purchase Agreement, entitled "Conditions of Deposit", lists the circumstances under which the $200,000 deposit would be refundable to BW. It provides that "[t]he Deposit shall only be refundable upon the occurrence of any of the following: . . . (f) If the lender under the Existing Note and Existing Deed of Trust . . . does not formally approved [sic] the assumption of the Existing Note and Existing Deed of Trust by Buyer with no additional terms or conditions; provided that Buyer shall be obligated to pay an assumption fee of no more than 1% of the currently outstanding principal balance of the Existing Note in connection with such assumption." There is no reference to impound or escrow accounts required by the lender in Section 33(f).

On November 30, 2012, Debtor filed a motion for Court approval of the Purchase Agreement and the sale of the Property to BW. About one week later, on December 7, 2012, BW terminated the Purchase Agreement by a letter personally delivered to the Debtor's principal, Dr. Gary Rettig. The letter's closing sentence held out the possibility the deal could be salvaged: "We hope to be able to work out a solution with you to resolve the issues discovered during our due diligence and to attempt to reinstate the agreement on mutually agreeable terms."

This optimism proved to be well founded, and on or about December 14, 2012 BW and the Debtor entered into an Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate, dated as of December 10, 2012 (the

"Amendment").  The Amendment reduced the purchase price by $500,000 to $9.4 million, continued the Purchase Agreement in full force and effect (except as modified by the Amendment) and stated various other terms.  Numbered paragraph 8 of the Amendment, entitled "Loan Approval," provided that "[a]pproval of Buyer's assumption of the existing loan encumbering the Property and Buyer's approval of the conditions to such approval shall remain a condition of the Closing in favor of both Buyer and Seller."[1]

The Court granted Debtor's motion and approved the Purchase Agreement and the sale at a hearing on January 7, 2013.  The order approving the sale (the "Sale Order") was entered on January 18, 2013 and provides in relevant part that "the sale of the Property is conditioned on the Bank consenting to the assumption of the underlying indebtedness on terms agreed to by the Parties."  Sale Order at 3.  The Sale Order also provides in numbered paragraph 20 thereof that "[i]n the event that the Buyer breaches any term of the Agreement, including but not limited to failing to timely close the purchase, Debtor shall retain the deposit as nonrefundable liquidated damages, subject to the terms of the Agreement."

The transaction again began to founder in mid-February 2013.  BW principal Bryon Ward sent a letter dated February 15, 2013 to Dr. Gary Rettig contending that "income from the property as a whole is significantly less than what was set forth in the offering materials" (in part because of rent delinquencies on the part of Property tenants) and noting that "many of the tenant matters stated herein caught us by surprise."  This was followed up by an email from BW attorney Kim Thompson to Debtor attorney Sarah Boone, dated March 12, 2013, proposing a reduction in the purchase price to account for certain lost rents, for a total downward purchase price adjustment of $201,322.  The Debtor was unwilling to accede to this proposal, and on March 29, 2013, Mr. Thompson sent an email to Ms. Boone indicating that BW was willing to proceed with the transaction at the current purchase price.

---

[1] Hereinafter, the term "Purchase Agreement" is a reference to the Purchase Agreement, Addendum and Amendment unless context requires otherwise.

The initial deadline to close the transaction was in February 2013. Pursuant to multiple stipulations, the deadline was extended to May 10, 2013.

At some point during the transaction – clearly after the execution of the Purchase Agreement and clearly before the May 6 email discussed below – the Bank demanded increased escrow impounds that were approximately double the $150,000 in impounds required of the Debtor.[2] The Bank wanted increased impounds to protect itself against unpaid leasing commissions (despite BW's protest that it had business policies and practices not to pay leasing commissions), unfulfilled tenant improvement allowance obligations (despite BW's protest that it had business policies and practices not to agree to pay tenant improvement allowances), and rights to sweep BW's account for receiving rents in the event there was an adverse change in the debt coverage ratio.[3] BW found these demands objectionable and a substantial obstacle to its assumption of the existing note and deed of trust.

On May 6, 2013 – four days before the closing deadline of May 10, 2013 – BW attorney Kim Thompson sent an email to Ms. Boone, Marla Berman and Ron Oliner (attorney for the lender holding the note and deed of trust on the Property) stating that "the only way in which to make the acquisition pencil out" was to (i) defease the existing loan and (b) "to acquire the property as part of a tax deferred exchange." The Court finds as a fact that the effect of this email was to place the Debtor and Bank on notice that BW did not desire to assume the note and deed of trust and, consequently, was dropping all efforts to assume them.

The email's reference to making the transaction "pencil out" indicates that BW was unhappy with the overall expected profitability of the transaction to BW, that it was looking for a way to make the transaction a bit richer, and that the way to make the transaction richer was to abandon the current straight-up sale structure and to convert it, in Mr. Thompson's words, to a "tax deferred exchange."[4] Although the parties had

---

[2] Reporter's Transcript at page 8.
[3] Reporter's Transcript at pages 8-9.
[4] It is difficult to know precisely what BW had in mind when it wanted to restructure the transaction as a tax deferred exchange. A tax deferred exchange is generally sought by a seller of property (who desires to avoid paying

previously agreed to a straight up sale with a down payment and an assumption of an existing liability, BW now wanted to convert the transaction into a tax deferred exchange and, instead of assuming the note, to defease it.

Ms. Boone responded to Mr. Thompson's email on the following day, May 7, 2013. She informed him that the proposed restructuring of the transaction was unacceptable to the Debtor[5] and demanded that BW complete the assumption and close the sale. On May 9, Mr. Thompson sent an email to Ms. Boone pointing out that the transaction was not going to close on May 10 but nevertheless reaffirming BW's interest in acquiring the Property through a defeasance and tax deferred exchange.

As Mr. Thompson correctly predicted, Friday, May 10, 2013 came and went without a closing. On the following Monday Ms. Boone sent an email demanding that the Title Company not release the $200,000 deposit "absent written agreement of the parties or Court order." The Title Company has complied with this request.

Ultimately, BW terminated the Purchase Agreement. Declaration of Kim D. Thompson at numbered paragraph 5. No date is given for the termination, but it presumably occurred sometime after May 10, 2013 and before the date of Mr. Thompson's declaration, May 23, 2013.

BW made no effort to obtain the Bank's agreement to the assumption of the existing note and deed of trust between the time Mr. Thompson's May 6 email was transmitted to Ms. Boone and the May 10 closing date. BW did not ask the Bank to reconsider its position with regard to the impound accounts during this time period nor

---

taxes on the sale), not by a buyer who is paying cash and assuming existing debt. A buyer generally does not pay federal income tax in such a transaction. The reference to a tax deferred exchange may have envisioned a *Starker*-type exchange under section 1031 of the Internal Revenue Code in which a qualified intermediary would have used cash and securities furnished by BW (for purpose of defeasing the loan) to acquire the Property free and clear of the existing deed of trust and then to acquire replacement real property held by an unidentified third party by trading the Property for such replacement property, with the replacement property being conveyed to BW. The tax benefit from such a transaction would be realized only by the unidentified third party, but possibly a *quid pro quo* for the saved tax dollars would have made the overall transaction richer for BW. Suffice it to say that whether or not this was what BW intended, Debtor did not bargain for a complicated tax deferred exchange when it entered into the Purchase Agreement, and the Purchase Agreement does not envision or provide for such a transaction.

[5] It also proved to be unacceptable to the Bank. In an email from Bank attorney Ron Oliner to BW attorney Penelope Parmes and others, dated June 4, 2013, Mr. Oliner wrote: "No to defeasance. We have been crystal clear on this from the May 6 announcement that your client wanted to go this route."

did it attempt to negotiate a modification in the Bank's position (for a release of the additional impounds relating to a leasing commission or tenant improvement allowances upon tender of proof that no amounts were payable) that may have taken the sting out of the impounds and made the transaction acceptable to BW. Nor did BW negotiate with the Bank over the Bank's cash sweep rights. There is no evidence before the Court indicating that the Bank's position on any of these issues was nonnegotiable.[6]

## CONCLUSIONS OF LAW

BW's renunciation on May 6, 2013 of an assumption and its demand to restructure the transaction as a tax deferred exchange coupled with a defeasance was a material breach of its obligations under section 3.1(c) of the Addendum to the Purchase Agreement to use commercially reasonable and diligent efforts to obtain the Bank's approval of an assumption of the note and deed of trust. The Purchase Agreement required BW to keep working in good faith for an assumption until the close of business on May 10, 2013, not to throw up its hands and to propose – at the eleventh hour – a wholesale restructuring of the purchase transaction in a manner completely foreign to the Purchase Agreement. On May 6 there were still four days left to reach agreement with the Bank, but BW chose (five months into the deal) to abandon the assumption. It was not commercially reasonable nor was it diligent for BW to cease negotiations with the Bank relating to the assumption of the loan under these circumstances.[7]

The May 6 email does not merely propose an alternative form of transaction with the caveat that BW is still working for, and will continue to work for, an assumption.

---

[6] The "no to defeasance" email of Mr. Oliner referenced in footnote 2 tends to show that the Bank was not shy about saying no when it encountered an unacceptable term that was essentially nonnegotiable or a "deal breaker." The absence in the record of emails or other communications from the Bank drawing a line in the sand on the impound and cash sweep issues is instructive in this regard.

[7] It might be different if the Bank had drawn a line in the sand and told BW that no way, no how, would it retreat from its demands with respect to the impound accounts and the cash sweep. However, as pointed out earlier, there is no evidence before the Court indicating this degree of intransigency on the part of the Bank.

Rather, it makes it clear that an assumption transaction is off the table.

Additionally, it is significant that this email was transmitted to the Bank's counsel, Mr. Oliner.  BW <u>wanted</u> the Bank to know that an assumption was off the table.

There is no doubt that BW's interest in an assumption transaction vanished on May 6 nor is there any doubt that BW still wanted to acquire the Property on that date (albeit in a transaction not contemplated by the Purchase Agreement).  The duty of exercising commercially reasonable and diligent efforts was a continuing duty, arising at the inception of the contract and remaining in existence up until the close of business on the May 10 closing date or at least until the point when it became clear that further efforts to obtain the Bank's agreement to acceptable terms would be futile.  The point of futility was never reached in this transaction because there is no evidence before the Court indicating BW negotiated with the Bank between May 6 and May 10 with respect to the impounds or cash sweep or that the Bank had previously made it clear that all provisions relating to the impounds and cash sweep were nonnegotiable.

Section 1.1 of the Addendum to the Purchase Agreement gave BW the right to terminate the Purchase Agreement if the parties were unable to obtain the Bank's approval of the assumption within 45 days of the date of the Purchase Agreement.  BW argues that section 1.1 supports its contention that it rightfully terminated the Purchase Agreement and therefore is entitled to the return of its deposit.

Section 1.1 is unhelpful to BW because it did not terminate the Purchase Agreement in the May 6 email (or prior to May 6).  To the contrary, BW was eager to keep the Purchase Agreement in force (on terms other than those agreed to) so that it could acquire the Property.  The termination of the Purchase Agreement came later, after BW had already materially breached during the May 6 through May 10 timeframe. An effective termination of the Purchase Agreement by BW prior to May 6 would have eliminated its duties of diligence and commercial reasonability concerning the assumption (on a going forward basis, not on a retroactive basis), but the termination came too late for this.

  Section 33 of the Addendum to the Purchase Agreement does not alter the Court's analysis.  Although BW was entitled to a return of its deposit if the Bank failed to agree to an assumption with no additional terms or conditions other than the 1% assumption fee, this entitlement presupposes that BW honored its obligation to use commercially reasonable and diligent efforts to obtain assumption approval.  As discussed above, BW failed to fully satisfy this obligation and materially breached it on May 6, 2013.

  Under the doctrine of constructive conditions, BW's material breach of the Purchase Agreement on May 6 entitled the Debtor to suspend performance of its various duties under the Purchase Agreement, such as the duty to deliver closing documents to BW.  *Sanchez v. San Bernardino*, 176 Cal. App. 4th 516, 530 (2009).

  Pursuant to numbered paragraph 20 of the Sale Order, BW's breach of the provision of the Purchase Agreement requiring commercially reasonable and diligent efforts by it to assume the existing note and existing deed of trust and its subsequent failure to timely close the purchase entitles Debtor to retain the deposit as nonrefundable liquidated damages.

  Based upon the foregoing, the Court will grant the Debtor's Motion and the Debtor's Supplemental Motion.  The BW Motion is denied with prejudice.

  No attorneys' fees will be awarded to any party in this matter.  Numbered paragraph 20 of the Sale Order makes the forfeiture "subject to the terms of the Agreement."  The term "Agreement" is defined in numbered paragraph 2 of the Sale Order to mean the Purchase Agreement and Amendment.  Section 21 of the Purchase Agreement provides that upon payment of the deposit to the Debtor, BW "shall be released from any further liability to [Debtor] . . ."  There is no carve-out in Section 21 for Section 16, which provides for an award of attorneys' fees to a prevailing party in the event an action is brought to enforce the terms of the Purchase Agreement.  The entirety of Section 21 is in boldfaced upper case letters, whereas Section 16 is in upper and lower case letters and generally is not in boldface.  This would seem to suggest the

parties regarded Section 21 as of more relative importance than Section 16 and that it controls over Section 16 should a conflict in interpretation arise .For these reasons, the Court concludes that the release of liability includes a release of any right of the Debtor to obtain attorneys' fees following payment of the deposit to Debtor.  BW is not entitled to attorneys' fees for the obvious reason that it is a breaching party, not a prevailing party.

It is ordered as follows:

1. Debtor is entitled to and shall retain, as the unencumbered property of Debtor's bankruptcy Estate, the $200,000 deposit paid by BW in connection with BW's proposed purchase of 1617 Westcliff Drive, Newport Beach CA, as Debtor's liquidated damages pursuant to the Purchase Agreement, Addendum, and Amendment thereto between Debtor and BW;

2. The Title Company shall immediately release the $200,000 deposit to Debtor;

3. First American Title Company Escrow No. 4245219 between Debtor and Burnham Ward is hereby cancelled; and

4. Debtor's request for attorneys' fees is denied.

5. Burnham Ward's request for Judicial Notice in support of the Motion is granted; and

6. Burnham Ward's request for attorneys' fees is denied.

###

Date: June 28, 2013

Mark S. Wallace
United States Bankruptcy Judge


# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): MEMORANDUM DECISION AND ORDER was entered on the date indicated as ⌐Entered¬ on the first page of this judgment or order and will be served in the manner stated below:

**1. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** ─ Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of 6/24/13, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

- Sarah C Boone    sboone@marshackhays.com, ecfmarshackhays@gmail.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com, ecfmarshackhays@gmail.com
- Aron M Oliner    roliner@duanemorris.com
- Penelope Parmes    pparmes@rutan.com
- Leonard M Shulman    lshulman@shbllp.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

*Debtor*
**1617 Westcliff, LLC**
2651 Waverly Dr
Newport Beach, CA 92663

☐ Service information continued on attached page

**3. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an ⌐Entered¬ stamp, the party lodging the judgment or order will serve a complete copy bearing an ⌐Entered¬ stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐ Service information continued on attached page